[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO DISMISS ON DOUBLE JEOPARDY GROUNDS
 I. INTRODUCTION
Over a decade ago, on January 13, 1987, the body of Patricia Konesky was discovered in the third base dugout of the Kimberly Avenue baseball field in New Haven. In addition to severe blunt trauma to her head, Konesky had been stabbed 248 times. Several dimes were found near the body; an apparent message from her killer to the police that she was murdered for being an informant.
The initial police investigation did not lead to an arrest. As a result, on February 5, 1988, the state announced a $20,000 reward for information leading to the conviction of the person or persons responsible. A few weeks later Janice Tourangeau ("Tourangeau") told the police that she witnessed Konesky's murder and implicated the defendant, Murray Colton ("Colton") and another person as being responsible. The second person was never identified or located. In June 1988, Colton was arrested and charged with murder.
Colton's first trial in 1989 and second trial in 1990 resulted in hung juries. The jury in his third trial convicted him of murder and he was sentenced to fifty years imprisonment. In August 1993, the Connecticut Supreme Court reversed Colton's conviction and ordered a new trial. State v. Colton,227 Conn. 231 (1993) ("Colton I")
Colton I held that the trial court erred when it ruled that lines of cross examination that the defense wanted to pursue with Tourangeau were collateral and that the defense would not be permitted to offer extrinsic evidence in those areas. Colton I, supra, 242. The proposed cross examination related to Tourangeau's claim that, at the time of the third trial, she was CT Page 8520 no longer addicted to drugs and no longer engaging in prostitution. The Supreme Court observed that Tourangeau's motivation for testifying was of paramount importance. Colton I, supra, 250. In particular, whether the reward money prompted her statements to the police was highly relevant. Id. In this regard, Tourangeau had acknowledged that she was a drug abuser and prostitute at the time of the murder and that the continued need to get drugs influenced her not to come forward initially to the police. Id. The proposed cross examination challenged Tourangeau's claim that she had changed her lifestyle. The proferred testimony was offered to prove that she continued to be addicted to drugs and to engage in prostitution to support her drug habit. Colton I, supra, 251. The Supreme Court found that the areas of continued drug use and prostitution were not collateral matters but relevant to Tourangeau's motive for testifying. Colton I, supra, 252. The court observed that such testimony might have suggested to the jury that Tourangeau's testimony was motivated by a need for drug money and not to make a "new start" in life as she claimed. Colton I, supra, 250-252. The Supreme Court further observed that, in addition to bearing on her motive, the proffered testimony might have persuaded the jury that Tourangeau's "new start" claim was untrue, thereby undermining her entire testimony. Id. For these reasons, the case was remanded for a new trial.
After the remand to the trial court, Colton moved to dismiss claiming (1) double jeopardy principles barred a fourth trial; (2) there was insufficient evidence to proceed to trial because Tourangeau had died; (3) a fourth trial would undermine the integrity of the court; and (4) a fourth trial would undermine interests of justice. The trial court (Ronan, J.), after a hearing, denied the motion to dismiss. Colton then immediately appealed the courts denial of his motion to dismiss on double jeopardy grounds. State v. Colton, 234 Conn. 683, 686 n 5 (1995),[1] ("Colton II"). On appeal, Colton claimed (1) that the trial court erred in ruling that the double jeopardy claim was barred as a matter of law and (2) that the trial court improperly prevented him from questioning the prosecutor in order to prove his claim of double jeopardy based on prosecutorial misconduct. Colton II, supra, 686.
In Colton II, the Supreme Court considered the issue of whether a claim of double jeopardy could be raised in a motion to dismiss in the absence of a previous mistrial or reversal because of prosecutorial misconduct. Colton II, supra, 696. The court CT Page 8521 reviewed the law in this area including Oregon v. Kennedy,456 U.S. 667, 192 S.Ct. 2083, 72 L.Ed.2d 416 (1982). Kennedy held that double jeopardy bars a subsequent prosecution if there was prosecutorial misconduct in the first trial that "goaded" the defendant into seeking a mistrial. Oregon v. Kennedy, supra, 676. After Kennedy a split developed between the federal circuit courts as to whether a motion for mistrial was a prerequisite to a claim of double jeopardy based on prosecutorial misconduct. Compare Beringer v. Sheahan, 934 F.2d 110 (7th Cir.) cert. denied, 502 U.S. 1006 (1991) (motion for mistrial is a prerequisite) with United States v. Wallach, 878 F.2d 912 (2d Cir. 1992) (Wallach II), cert. denied, 508 U.S. 939 (1993) (motion for mistrial not required). Colton II acknowledged this conflicting authority and also observed mat me issue was one of first impression in Connecticut. Colton II, supra 696.
The Supreme Court in Colton II agreed with the reasoning of the Second Circuit that Kennedy logically should be extended to bar a new trial, even in the absence of a mistrial or reversal because of prosecutorial misconduct, if the prosecutor at the earlier trial engaged in misconduct with the intent to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct. Colton II, supra, 696 (citing Wallach II, supra 979 F.2d 916). On the basis of this holding, the Supreme Court remanded the case to consider the defendant's double jeopardy motion on its merits. Colton II, supra 700.
 II. THE REMAND HEARING
The remand hearing was extensive. The matter was heard over twenty eight scheduled days from July 22, 1996 to October 31, 1997. Colton entered 109 exhibits and thirteen pleadings were filed with the court. In addition, the trial prosecutor testified for over thirty hours.
 III. FINDINGS OF FACT
From the evidence presented at the remand hearing, the court finds the following facts:
Preparation of case for third trial.
At the time of his assignment to the Colton case, Assistant States Attorney James G. Clark (ASA Clark) was an experienced CT Page 8522 prosecutor. Prior to joining the New Haven State's Attorney's Office in 1988, he had spent two and one half years as supervisor of the Appellate unit of the Chief State's Attorney's Office. Once in New Haven, he was assigned to Part A and had tried about fifteen felony cases prior to the Colton case.
The prosecutors for Colton's earlier trials were not available to do trial three. In December 1990, ASA Clark started working on the file. He reviewed the transcripts of the probable cause hearing, trial one, trial two, as well as the police reports, statements and other documents in the trial file.
ASA Clark did not fear that an acquittal was likely to occur in the case. To the contrary, he did not see an acquittal as even a remotely possible result. After his review of the file and his own investigative efforts, he believed Tourangeau's account of what happened on the ballfield.
ASA Clark also believed Tourangeau's description of her drug use at various relevant times. His personal observations of her for twenty hours over fifteen days while preparing her testimony convinced him that she was not using drugs at the time of the third trial in 1991 She showed no physical manifestations of drug use.
The investigative efforts either conducted by ASA Clark or under his direction included the following:
 a. He determined that the street lights in the vicinity of the crime scene had higher wattage than typical for city lights in New Haven;
 b. He spoke with two witnesses, Warren Bussert and Ed Gourd who saw the victim and Colton walking down the street together near Don Phillips bar at a time when Colton claimed to be out of the area with his father;
 c. He reviewed the case with Dr. Henry Lee and learned that, in Dr. Lee's view, two people were present with the victim in the dugout based on the forensic evidence;
 d. He learned that Mariana Foster had gone out on a date with Colton during which Colton remarked, "yeah some bitch dropped a dime on my dad and she got hers."
CT Page 8523
 e. He learned that Cheryl Herring had had an argument with Colton during which Colton stated, "I'd like to do you too bitch."
ASA Clark reviewed Tourangeau's statements about her witnessing the murder given (1) to the Connecticut State Police prior to her polygraph examination; (2) to the New Haven Police Department; (3) during her testimony at the probable cause hearing; (4) during her testimony at the first trial, and (5) during her testimony at the second trial. ASA Clark felt that it was unusual to have multiple examinations of a person by so many skilled questioners. He noted that throughout these multiple examinations, she remained essentially consistent.
In addition to Tourangeau's consistency and the evidence he learned of from investigation, ASA Clark believed other factors supported his belief that the third trial would not end in an acquittal: First, no evidence of animus between Tourangeau and Colton was ever brought out. The evidence showed that, in fact, Tourangeau had only a passing knowledge of Colton. Second, when she came forward, Tourangeau believed the reward to be $10,000 (when, in fact, it was $20,000) suggesting that she was not focused on the reward. Third, Tourangeau's statement never mentions seeing a knife or a stabbing notwithstanding the fact that by March 1988 when she came forward it was widely known that the victim was stabbed 248 times.
Tourangeau's Use of Drugs
ASA Clark did not see Tourangeau's use of drugs as an outcome determining factor in the case. ASA Clark reasoned that during the first trial Tourangeau testified that she used drugs and the result was a hung jury; during the second trial she testified that she was cleaned up and the jury result was the same. He did not think it mattered whether Tourangeau was on drugs or not.
ASA Clark felt that the first trial came close to resulting in a conviction and was well tried. He believed that Tourangeau could benefit from demonstration aids in addition to her oral testimony. ASA Clark saw the second trial as a less thorough presentation to the jury — particularly the cross examination of Colton. In planning for the third trial, ASA Clark did not attempt to present a "cleaned up" Tourangeau in order to avoid an acquittal.
CT Page 8524
During the direct examination of Tourangeau by ASA Clark at the third trial, the subject of her so called "life change" came up as follows:
1. Q Now, at the time that this occurred were you addicted to drugs.[2]
A Yes
Q And what were you addicted to?
A I was addicted to heroin.
 Q And when you went to see Patty Konesky were you seeking out heroin?
 A No, cocaine, because I had already, done my heroin and, you know, a couple of times before that, you know, Patty and I have stayed up all night in her place and done up some coke.
Q All right. Were you addicted to cocaine at the time?
A No.
Q While we're on it, are you currently addicted to heroin?
A No.
Q Currently addicted to cocaine?
A No.
Q Do you use cocaine and heroin at this time?
A No.
T. pp. 479, 480
2. Q And you mentioned that you were at this time no longer addicted to any drug, is that correct?
A Yes, sir.
Q And how did you manage to do that? CT Page 8525
A I don't understand.
 Q How did you manage to accomplish getting off your addiction?
A I went to jail.
 Q Were you ever on any particular programs that helped out?
 A None that really helped. I was on a methadon program but as soon as they detoxed me I went right back to the streets.
Q So, you kicked it by going to jail?
A Yes.
T. pp. 524, 525
3. Q And do you recall at what point between the time Detective Ortiz told you that was possible and now you made that decision?[3]
 A As soon as my life started to change. The other trials I refused it. I didn't want the money.
 Q And what in your life changed to make you change your mind about whether you wanted the reward?
 A A lot. I've gained part of a family back. I'm not a drug user. I need a new life. After all the retaliation I'm going to get, I need to start my family and myself on a new life.[4]
T. 546.
The subject of Tourangeau's drug use or life style was not raised in the redirect examination of her by ASA Clark. During the lengthy closing arguments presented by both counsel, lasting a full two and one half hours, only one oblique reference to this area was made. During rebuttal argument, ASA Clark referred to Tourangeau as a "former prostitute and drug addict." The state did not emphasize this area either in its presentation of CT Page 8526 Tourangeau as a witness or in its argument to the jury.
Polygraph
ASA Clark was aware, prior to the third trial, that Tourangeau had been given a polygraph examination by the Connecticut State Police. The results of the examination were inconclusive. The polygraph examination was given shortly after Tourangeau gave her March 1988 statement to the New Haven Police Department that implicated Colton. The decision to have Tourangeau polygraphed was made by Lt. Michael Sweeney.
ASA Clark discussed the polygraph results with Detective Francisco Ortiz. Ortiz told ASA Clark that he believed Tourangeau and thought that the polygraph was a waste of time. Ortiz further stated that Sweeney never liked Tourangeau and that was the reason for the polygraph in the first place. ASA Clark talked with two other police officers involved in the case, Detectives Anthony DiLullo and Joseph Pettola, both of whom told ASA Clark that they believed Tourangeau.
The fact of the polygraph exam and the tapes of the State Police interview with Tourangeau were turned over to the defense. The inconclusive polygraph results did not raise a fear of acquittal in the mind of ASA Clark.
June 1990 Drug Arrest
ASA Clark was aware that in June 1990 Tourangeau was arrested by the New Haven Police Department purchasing narcotics. She was later convicted of possession of narcotics as a result of this arrest. In April 1990 during the second trial, Tourangeau testified that she was no longer using intravenous drugs at that time and had last used drugs before she went to jail in 1989.
ASA Clark spoke to Tourangeau about this matter during the preparation for the third trial. Tourangeau told ASA Clark that she had bought the drugs for a friend because she had the connection. She said she was caught and pleaded guilty. Tourangeau told ASA Clark — "That was stupid, I did someone a favor." ASA Clark obtained the police report regarding this arrest. He did not contact the investigating officers or the prosecutor handling the drug case. He did not contact the other persons with Tourangeau at the time of her arrest. CT Page 8527
ASA Clark believed that Tourangeau's drug use was significant only insofar as it related to relevant times. That is, times when Tourangeau (1) saw things, (2) spoke with the police, or (3) testified. Other times in his view were not relevant. The police report of the June 1990 arrest was disclosed to the defense for use in its cross examination of Tourangeau.
Prostitution
ASA Clark was aware that Tourangeau was a prostitute in 1987 and early 1988. Tourangeau did not say when she stopped engaging in prostitution and ASA Clark did not ask her. Tourangeau testified that she supported her drug habit through prostitution. In October 1990, the Milford Police Department arrested Tourangeau for criminal trespass after seeing her at the Mayflower Truck Stop parking lot talking with a truck driver. The police report (Exhibit 36) contains the officers remarks that he was in the area in an undercover capacity looking for prostitution activity. The report contains no evidence of Tourangeau engaging in prostitution.
ASA Clark did not have the Milford police report prior to the third trial. The report was obtained by the defense, and came to ASA Clark's attention during the trial. ASA Clark did not question Tourangeau about the Milford report because he considered the entire matter irrelevant and collateral.
Tourangeau's Claims Re: $90,000
ASA Clark was aware that Tourangeau had said different things about her intent to collect the reward money. In her statement to the State Police, she said that she was not interested in the reward and would sign papers waiving any claim to it. She also told the State Police that money did not "turn her head" and that she once had ninety thousand dollars and spent it in a short period of time. On cross examination, she was asked about her comment that she once had ninety thousand dollars. ASA Clark did not ask her about this in detail. The subject was mentioned with Tourangeau and she said that her former husband's children had died in an auto accident and a lot of money was paid as a result. ASA Clark made no further inquiry and did no investigation into this matter. He considered the statement to be immaterial.
Furniture Theft Complaint
CT Page 8528
ASA Clark was aware that in May 1988 Anthony Tourangeau, Janice Tourangeau's former husband, complained to the New Haven Police Department that Janice had wrongfully taken his furniture. The police did not make an arrest. ASA Clark had read the police report regarding this incident at the time of Janice Tourangeau's testimony. When questioned about this on cross examination, Janice Tourangeau denied that she had wrongfully taken the furniture. She testified that the furniture was hers and that she had retrieved it and given it to a friend to hold.
ASA Clark considered the furniture incident to be totally irrelevant. It was simply a complaint and no more. He did not talk to the police officer who prepared the report.
REWARD
ASA Clark understood that Tourangeau's motivation regarding the reward was relevant. He did not, however, view her desire to collect the reward to be affected by drug addiction. At the third trial, Tourangeau testified that she wanted the reward more than at other times. In ASA Clark's view, once she said that she wanted to collect the reward, why she wanted the money did not matter.
ASA Clark felt that the jury needed to know something about Tourangeau so he briefly went into her history of drug addiction. In one response, Tourangeau stated that she decided to seek the reward after her life started to change. ASA Clark did not anticipate Tourangeau to give that response. The answer was not planned in advance.
Physical Observations of Tourangeau
ASA Clark asked Tourangeau if she was still using drugs. She said no. ASA Clark did not observe Tourangeau to show any physical effects of drug use. ASA Clark did not ask other people about whether she continued to use drugs.
Police Efforts to Corroborate Tourangeau
During the police investigation of the murder, attempts were made to interview persons at locations in the Kimberly Avenue area to see if they remembered Tourangeau being in certain places on January 12, 1997. These efforts were made in April 1988 after Tourangeau came forward. ASA Clark did not offer testimony about CT Page 8529 these police efforts. The reports, however, were disclosed to the defense.
Good Samaritan
Tourangeau stated that after seeing Patty Konesky be attacked in the dugout she fled the area and jumped into the car of a passing motorist who drove her from the area. In preparing for the trial, ASA Clark placed a newspaper ad for the "Good Samaritan" who gave Tourangeau a ride. There was no response to this ad. ASA Clark did not offer evidence about this at trial, but did disclose this material to the defense.
Hustling $2000.00 Per Week
During the cross examination of Tourangeau, she told defense counsel that she could earn $2000 per week. ASA Clark believed that hustling for money was typical of her street life at the time. He never questioned Tourangeau in detail about this. While he suspected that the $2000 per week might be somewhat of an exaggeration, he did not see it as a lie.
Counselor
ASA Clark was not specifically aware that Tourangeau had stated that she came forward, in part, because a counselor advised her to do so. He did know that mental and emotional pressure prompted her to come forward. ASA Clark did not take any action to locate the counselor and did not ask Tourangeau about professional counseling.
Visibility
During his trial preparation, ASA Clark took steps to evaluate Tourangeau's statement that she was able to see Colton and the murder. While he did not attempt to replicate the conditions on the night of the murder, he did do the following:
1. he personally visited the field;
 2. he determined that the manhole cover where Tourangeau stated that she first saw Colton from a distance of 25 feet was near a light pole;
 3. he determined that the light in the light pole was 400 CT Page 8530 watts as opposed to the customary 150 watts for city lights;
 4. he contacted an astronomer to determine the angle of the moon and determined that the shadow of the dugout would not obstruct vision;
 5. he went outside his own home on a bright moonlit night to determine what one could see; and
 6. he contacted the National Weather Service for satellite photographs — none were available.
 IV. DISCUSSION
The question before the court on this remand can be stated as follows:
 Did ASA Clark engage in prosecutorial misconduct with the deliberate purpose of depriving Colton of his double jeopardy shield?
Colton II, supra. 700.
Phrased another way, the Supreme Court described the issue as follows:
 Furthermore, the defendant must prove that the misconduct of the prosecutor was undertaken not simply to prevent an acquittal, but to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct.
Id.
Despite the length of the hearing and the aggressiveness of the arguments, the evidence does not support the defense claim that ASA Clark intentionally presented Tourangeau to the jury in a false light in order to avoid an acquittal he believed was likely. Whether Tourangeau presented herself to the jury falsely is a different question. ASA Clark's objection during the third trial to defense efforts to show that Tourangeau did not abandon her drug abusing, street hustling ways was probably unwise. As a result, Colton has been awarded a new trial. Such objections, however, are not misconduct. Colton II, supra 698 n. 15. CT Page 8531
The question of whether ASA Clark committed prosecutorial misconduct turns on the reach of the prosecutor's duty regarding the presentation of evidence. It is clear that a prosecutor has a duty, not solely to obtain convictions, but to ensure that all evidence tending to aid in the ascertaining of truth be laid before the court. State v. Hammond, 221 Conn. 264, 292 (1992). This duty imposes an obligation on the prosecutor to investigate the veracity of a witness's potential testimony in order to determine if that witness should testify. Id.; Colton II, supra 691 n. 11. Moreover, a prosecutor may not intentionally avoid pursuit of evidence because it will damage the prosecution's case or aid the accused. Id.
Colton's claim is that ASA Clark committed misconduct by turning a "blind eye" to available evidence that contradicted Tourangeau's statements about drug use, money and the reward. In so doing, Colton asserts that ASA Clark intentionally "portrayed" Tourangeau as a reformed drug addict when, in fact, he knew (or could easily have determined) that she was not so reformed. It is important to note that Tourangeau's drug use, while germane to her credibility, was not a central issue in the trial.[5] What she claimed to see at the ball field was pivotal. As to that, ASA Clark took reasonable efforts to satisfy himself that her potential testimony was truthful. Indeed, ASA Clark's investigation of street lighting, moon angles and crime scene reconstruction exceeded what one would customarily expect.
That however is only one side of the issue; the other side concerns ASA Clark's actions as to matters that could harm the state's case. As to many matters raised by the defense, ASA Clark's failure to investigate was clearly not misconduct. A prosecutor does not have to check out every single word a witness says — the legal and ethical obligation does not go that far. See commentary ABA Standards for Criminal Justice Prosecution Function, Third Edition § 3-3.11(c) (duty of the prosecutor is to acquire all relevant evidence) (emphasis added). ASA Clark was not required to reject Tourangeau's testimony because her polygraph result was inconclusive. Nor did he have to check into the reasons for the polygraph more than he did. His failure to conduct investigations into Tourangeau's claims that she once had ninety thousand dollars and blew through it and that she could make $2000 per week hustling were not misconduct. Likewise, it was not misconduct to view a dispute about who took whose furniture between Tourangeau and her ex-husband as CT Page 8532 collateral to the murder charge. ASA Clark's failure to offer evidence about the Good Samaritan advertisement or the police departments negative efforts to place Tourangeau at various bars, also do not amount to misconduct in violation of the Hammond andColton II standard.
ASA Clark's handling of Tourangeau's June 1990 arrest for purchasing narcotics presents a closer question. Did he avoid the obvious by accepting her explanation that she was purchasing drugs for someone else? Is his conduct akin to the prosecutor's in Wallach II who accepted their witness's explanation that he signed gambling markers at a casino not to gamble but to pay off old markers? Wallach II supra, 913. The fact that ASA Clark disclosed the arrest report to the defense. substantially undercuts any claimed misconduct stemming from his uncritical acceptance of Tourangeau's dubious explanation. The defense had this report and sought to confront Tourangeau's claims about sobriety with contrary evidence. As noted above, the state's objection to this evidence ultimately lead to the reversal of Colton's conviction.
Even if one assumes arguendo that ASA Clark did commit prosecutorial misconduct in failing to check out Tourangeau more thoroughly, for such misconduct to raise a double jeopardy bar it must have been undertaken to prevent an acquittal that the prosecutor believed was likely in the absence of his misconduct. As the United States Court of Appeals for the Seventh Circuit has stated:
 It is not enough that there was an error; it is not enough that it was committed or procured by the prosecutor; it is not enough that it was deliberate prosecutorial misconduct; it must in addition have been committed for the purpose of preventing an acquittal that, even if there was enough evidence to convict, was likely if the prosecutor refrained from misconduct.
 United States v. Catton, 130 F.3d 805, 807, 808 (7th Cir. 1997). Stated another way "only a highhanded wrong intentionally directed against the defendant's constitutional right will trigger his right not to be twice put in jeopardy for the same offense." Colton II, supra 700.
The claimed prosecutorial misconduct does not meet the standard set forth above. First, ASA Clark did not fear an CT Page 8533 acquittal and that was a reasonable belief for him to have. Given the additional investigation that undermined Colton's alibi, Colton's incriminating comments to two women, Dr. Lee's opinion that there were two assailants which corroborated Tourangeau, and the fact that Tourangeau had remained essentially consistent in her testimony at the HPC and two previous trials, it was entirely reasonable for the state to believe that it had a better case to present to the jury than at the earlier trials. Since both earlier trials resulted in hung juries, there was no reason to believe that a worse result would occur at the third trial.
Second, unlike the typical mistrial situation where the state can confidently assume that it will be allowed to try a defendant again, in this case that was far from clear. At root, the double jeopardy clause protects a defendant's right to have his guilt or innocence determined before the first trier of fact. UnitedStates v. Scott, 437 U.S. 82, 93 (1978). Here, the state wanted this case decided by the third trial jury just as much as the defendant did. As an experienced prosecutor, ASA Clark would have known that if the third trial ending in a hung jury substantial pressure would have been put on the state to end the prosecution.Wallach II held that deliberate prosecutorial misconduct during trial that is concealed can be tantamount to misconduct intended to "goad" a defendant into moving for a mistrial. Wallach II, supra, 916. Such goading conduct on the part of the prosecutor was held by the United States Supreme Court to raise the potential of a double jeopardy bar to reprosecution. Oregon v.Kennedy, supra, 675-76. This analysis breaks down where, as here, the procedural history of the case suggests that a mistrial might do the state no good.
Finally, ASA Clark's handling of Tourangeau is far from the type of "high handed wrong" that should bar the reprosecution of a murder case. She was the sort of "street-type" witness that testify in criminal cases regularly. Such witnesses pose problems for both prosecution and defense. ASA Clark disclosed all of the information he had that bore on her credibility. Tourangeau's testimony that she wanted the reward money because her life had started to change was not planned in advance. ASA Clark did not anticipate this response. There was no false "portrayal" of Tourangeau as something she was not. She may very well have mislead the jury about her lifestyle and use of drugs, but in the full context of this case that fact does not equate with the deliberate intentional prosecutorial misconduct required for a double jeopardy dismissal. CT Page 8534
 CONCLUSION
For the reasons set forth above, the motion to dismiss is denied
So Ordered at Hartford, Connecticut this 14th day of July, 1998.
Robert J. Devlin, Jr., Judge