LAURIE PALOMBA *v.* RICHARD E. GRAY
(13047)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and HULL, JS.

Argued March 9—decision released June 21, 1988

*Denise Derby,* for the appellant (defendant).

*Joseph X. DuMond, Jr.,* assistant attorney general, with whom, on the brief, were *Joseph I. Lieberman,* attorney general, and *J. Bernard Davis* and *Robin L. Wilson,* assistant attorneys general, for the appellee (state).

HULL, J. The defendant in this paternity action, Richard E. Gray, appeals from the decision of the trial

court setting aside the jury's verdict and ordering a new trial. We find no error.

The record discloses the following. The plaintiff, Laurie Palomba, and the defendant met in the summer of 1975 when the plaintiff was thirteen years old and the defendant was fifteen years old. They both lived on Rawley Avenue in Waterbury. Shortly after they met, they began to have sexual relations. According to the plaintiff, their relationship continued until October 13, 1975. She testified that she had last had sexual intercourse with the defendant in the beginning of October, 1975. The defendant stated that he had moved from Rawley Avenue to Wolcott the first week of August, 1975, and that he had last had sexual intercourse with the plaintiff while he lived on Rawley Avenue. He testified that he did not visit the plaintiff on Rawley Avenue after he moved to Wolcott. Sometime during August, 1975, the plaintiff moved from Rawley Avenue to Yale Street in Waterbury. She claimed that the defendant had visited her at her new home and that it was there that they last had sexual intercourse. The defendant admitted having visited the plaintiff on Yale Street two or three times but did not recall whether they had engaged in sexual intercourse. The defendant terminated their relationship by telephone on October 13, 1975. At that time the plaintiff suspected that she was pregnant. Her pregnancy was confirmed by her doctor in December, 1975. On May 6, 1976, the plaintiff gave birth to a son.

In September, 1976, the plaintiff filed a verified petition for paternity proceedings against the defendant. The attorney general is a party to this action since the plaintiff and her son are recipients of public assistance. General Statutes § 46b-160.[1] In November, 1985, the

---

[1] "[General Statutes] Sec. 46b-160. (Formerly Sec. 52-435a). PETITION BY MOTHER OR EXPECTANT MOTHER. VENUE. CONTINUANCE OF CASE. EVIDENCE. Proceedings to establish paternity of a child born or conceived out

case was tried to a jury which returned a verdict in favor of the defendant. The plaintiff timely moved to set aside the verdict and for a new trial. Both motions were granted by the trial court more than one year after the conclusion of the trial. The defendant appeals and the state is defending the appeal.

The defendant claims that: (1) the trial court erred in setting aside the verdict; (2) the trial court's 441 day delay in rendering its decision on the motion to set aside the verdict denied the defendant a fair trial in violation of his due process rights; and (3) the trial court violated his due process rights in its application of General Statutes § 46b-160.

I

The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against

of lawful wedlock, including one born to, or conceived by, a married woman but begotten by a man other than her husband, shall be instituted by a verified petition of the mother or expectant mother, with summons and order, filed in the superior court for the geographical area in which either she or the putative father resides. For trial purposes, jurors shall be selected from the judicial district in which such geographical area is located. In cases involving public assistance recipients the petition shall also be served upon the attorney general who shall be and remain a party to any paternity proceeding and to any proceedings after judgment in such action. Upon the filing of such petition, said court or any judge assigned to said court shall cause a summons, signed by him or by the clerk or assistant clerk of said court, to be issued, requiring the putative father to appear in court at a time and place named therein to show cause, if any he has, why the prayer of such petition should not be granted. Such petition, summons and order shall be in a form approved by the judges of the superior court. In the case of a child or expectant mother being supported wholly or in part by the state, service of such petition may be made by any investigator employed by the department of human resources or the department of income maintenance. Such petition may be brought at any time prior to the child's eighteenth birthday, provided liability for past support shall be limited to the three years next preceding the granting of any such petition. If the putative father fails to appear in court at such time and place, the court may hear the petitioner and enter such judgment and order as the facts may warrant. Such court may order continuance of such hearing; and if such mother or expectant mother continues constant in her accusation, it shall be evidence that the respondent is the father of such child."

the law or the evidence. *O'Brien* v. *Seyer,* 183 Conn. 199, 208, 439 A.2d 292 (1981). "The supervision which a judge has over the verdict is an essential part of the jury system. . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles, or as to justify the suspicion that they or some of them were influenced by prejudice, corruption or partiality." *Burr* v. *Harty,* 75 Conn. 127, 129, 52 A. 724 (1902). The court has a duty to set aside the verdict where the jury's action is so unreasonable as to suggest that it was the product of such improper influences. *State* v. *Avcollie,* 178 Conn. 450, 457, 423 A.2d 118 (1979), cert. denied, 444 U.S 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980), aff'd, 188 Conn. 626, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983); *Roma* v. *Thames River Specialties Co.,* 90 Conn. 18, 19–20, 96 A. 169 (1915). A verdict may be set aside even if the evidence was conflicting and there was direct evidence in favor of the party who prevailed with the jury. *Roma* v. *Thames River Specialties Co.,* supra, 20.

The decision to set aside a verdict entails the exercise of a broad legal discretion that, in the absence of clear abuse, we shall not disturb. *O'Brien* v. *Seyer,* supra. Our review of the trial court's action on a motion to set aside the verdict involves a determination of whether the trial court abused its discretion, according great weight to the action of the trial court and indulging every reasonable presumption in favor of its correctness; *Labatt* v. *Grunewald,* 182 Conn. 236, 240–41, 438 A.2d 85 (1980); *Levitz* v. *Jewish Home for the Aged, Inc.,* 156 Conn. 193, 198, 239 A.2d 490 (1968); since the trial judge has had the same opportunity as

the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their evidence. *Loomis* v. *Perkins,* 70 Conn. 444, 447, 39 A. 797 (1898). Moreover, the trial judge can gauge the tenor of the trial, as we, on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury. *Mather* v. *Griffin Hospital,* 207 Conn. 125, 139, 540 A.2d 666 (1988); *Birgel* v. *Heintz,* 163 Conn. 23, 26, 301 A.2d 249 (1972). The focus of our inquiry is the action of the trial court in setting aside the verdict. *Campbell* v. *Gould,* 194 Conn. 35, 39, 478 A.2d 596 (1984).

Litigants, however, have a constitutional right to have issues of fact determined by a jury. *Mather* v. *Griffin Hospital,* supra, 138; *Seals* v. *Hickey,* 186 Conn. 337, 350, 441 A.2d 604 (1982); *Jacobs* v. *Goodspeed,* 180 Conn. 415, 417, 429 A.2d 915 (1980). "The right to a jury trial is fundamental in our judicial system, and this court has said that the right is one obviously immovable limitation on the legal discretion of the court to set aside a verdict, since the constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court." *Camp* v. *Booth,* 160 Conn. 10, 13, 273 A.2d 714 (1970). Since, in setting aside the verdict, the trial court has deprived the party in whose favor the verdict was rendered of his constitutional right to have factual issues resolved by the jury, we must examine the evidential basis of the verdict itself to determine whether the trial court abused its discretion. *Jacobs* v. *Goodspeed,* supra.

The plaintiff in a paternity suit must prove her case by a fair preponderance of the evidence. *Lavertue* v. *Niman,* 196 Conn. 403, 407, 493 A.2d 123 (1985); *Terrasi* v. *Andrews,* 3 Conn. Cir. Ct. 449, 453, 217 A.2d 75, cert. denied, 153 Conn. 729, 214 A.2d 130 (1965).

Evidence that the plaintiff has been constant in accusing the defendant of being the father of the child is admissible at trial to corroborate her testimony and to establish a prima facie case. General Statutes § 46b-160; *Lavertue* v. *Niman,* supra; *Armstrong* v. *Watrous,* 138 Conn. 127, 129, 82 A.2d 800 (1951). Once the plaintiff has established a prima facie case, the burden shifts to the defendant to prove his innocence by evidence other than his own. *Mosher* v. *Bennett,* 108 Conn. 671, 674, 144 A.2d 297 (1929); *Holmes* v. *McLean,* 5 Conn. Cir. Ct. 476, 479, 256 A.2d 849 (1969).[2]

The trial court found that the evidence demonstrated that the plaintiff had given birth to her child following a nine month period of gestation, that the defendant admitted having had repeated sexual relations with the plaintiff within the period of conception, that the plaintiff had remained constant in her accusation, and that the defendant had admitted that she had been constant in her accusation. The court also stated that the defendant had failed to present evidence other than his own to prove his innocence and, thus, had not met his burden of proof. The trial court concluded that the jury's

[2] In *Lavertue* v. *Niman,* 196 Conn. 403, 407 n.6, 493 A.2d 213 (1985), we expressed some reservation regarding the validity of those cases articulating the burden-shifting rule in paternity cases and suggested that they might not reflect the law today. The defendant's challenge, however, to the trial court's application of the rule was not raised at trial, but arose for the first time in the plaintiff's motion to set aside the verdict. The defendant contends that by making competent evidence of constancy of accusation, General Statutes § 46b-160 relieves the plaintiff of her obligation to establish a prima facie case and impermissibly shifts the burden of proving his innocence to the defendant. He argues further that in requiring him to produce evidence other than his own testimony to prove his innocence, his own denial was rendered worthless and he was effectively deprived of his right to be heard throughout the proceedings. He urges us to review this claim under the exceptional circumstances doctrine of *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). Since we find that the plaintiff made out her prima facie case by evidence other than constancy of accusation and that the defendant's testimony alone was insufficient to overcome it, we need not consider the constitutional ramifications of these rules.

verdict was unreasonable in that it did not hold the defendant to his burden of proof. The trial court further held that the verdict for the defendant was so clearly against the evidence as to lead to the conclusion that the jury erred in its application of the law or had been influenced by "lack of knowledge or understanding, or moved by partiality or sympathy for the defendant."

We first address the trial court's conclusion that the jury did not hold the defendant to his burden of proof. The record discloses that, although the jury was charged that, upon the plaintiff's establishment of a prima facie case, the burden of proving his innocence shifted to the defendant, the court never instructed the jury that evidence other than the defendant's own testimony was required to meet that burden. Accordingly, the jury could not have been expected to apply that legal principle.

We conclude, however, that the trial court did not abuse its discretion in deciding that the jury's verdict was unreasonable in that it was so against the evidence as to compel the conclusion that it was the result of mistake, partiality or prejudice. Therefore, we hold that it was not error for the trial court to set aside the verdict.

The plaintiff, in addition to having testified to the time frame and the places at which she and the defendant had had sexual intercourse, stated that her son was a full-term baby, weighing seven pounds, eleven ounces and measuring nineteen inches at birth. She said that, during the October 13, 1975 telephone conversation, she had told the defendant that she thought she was pregnant and that the defendant was the first person she told of her suspicion, although it is not clear from her testimony whether she then told him he was the father. She also stated that for some time she did not

tell anyone else because she was afraid to do so, but that she eventually told her mother. She estimated that conception had occurred in September, 1975. She asserted that she had telephoned the defendant when she was sure she was pregnant and had told him the news, but, again, it is unclear whether she had told him he was the father. She stated emphatically that she had no doubt that the defendant was the father of her son. She also maintained that she had never had sexual relations with anyone before the defendant. She admitted that the child's birth certificate does not bear a father's name, but affirmed that she entered the defendant's name as father of the boy on forms she completed in connection with her application for public assistance. She denied having had sexual relations during the time in question with anyone other than the defendant.

Cynthia Murgatory Urso, a witness for the plaintiff, testified that she had lived on Rawley Avenue and had been a friend of both the plaintiff and the defendant during the summer and autumn of 1975. She said that before the plaintiff had become pregnant, the plaintiff had told her that she had been having sexual relations with the defendant. Urso stated that during the time the plaintiff was pregnant, she had had a conversation with the defendant about the plaintiff's pregnancy. Urso said that she had asked him if he was the father and he replied, "Yes, I am," or "Yes, I think so." On cross-examination, she testified that she and the defendant had been alone but she could not remember all the circumstances surrounding the conversation. She said that she considered herself a friend of both parties, that she had last seen the plaintiff about one year before the trial, that she had lately spoken to the plaintiff more frequently than usual because of the trial, but that she had not had much opportunity to talk to the defendant.

The plaintiff also presented testimony of her mother and sister. The plaintiff's mother testified that in response to her inquiry upon discovering that the plaintiff might be pregnant, the plaintiff told her that the defendant was the father of the child. Sheila Palomba, who is one year younger than the plaintiff, recalled that sometime around the end of September or the beginning of October, 1975, she entered the plaintiff's bedroom to find the plaintiff in bed and the defendant standing up, finishing closing his pants. She said this incident occurred at the house on Yale Street.

The defendant then testified that he had terminated his relationship with the plaintiff because he found out that she had been dating one Mark Niman. He corroborated the plaintiff's testimony that during a telephone conversation with her in October, 1975, he had ended the relationship and was told that she thought she was pregnant. He denied, however, that she had called him thereafter to tell him she was definitely pregnant. He asserted that he was not aware that she claimed he was the father until September, 1976, when he received the complaint in these proceedings and that, until then, he had not had any contact with the plaintiff following the October 13, 1975 telephone conversation. He denied he was the child's father.

On cross-examination, the defendant said that both he and Niman had been friends of the plaintiff at the time in question. He said he first started a sexual relationship with her in June or July, 1975, but did not remember how frequently they had had sexual intercourse. When asked if he maintained that he had never had sexual intercourse with the plaintiff in the house on Yale Street, he replied that he could not remember. Nor did he remember having had the conversation related by Urso, but conceded it was possible he had told her he was the father of the child. He denied that

the incident described by Sheila Palomba had ever occurred.

The defendant further testified to having argued with the plaintiff over her alleged liaison with Niman and that it was after he had told her their relationship was ended that she announced that she might be pregnant. He said that he had been told by James LeRoy about the relationship between the plaintiff and Niman just before he had moved to Wolcott. His responses to the questions of counsel for both parties then became somewhat confused and contradictory. He indicated that he did not see the plaintiff beyond August, 1975, which conflicted with his earlier testimony that he had visited her on Yale Street, but conceded that he had talked to her in person on Yale Street on a few occasions, although he could not remember when.

James LeRoy testified that he had been a friend of both parties in the summer and fall of 1975, but had not been in contact with either one for some years. He said that the plaintiff had been "going out" with both the defendant and Niman at the same time but admitted that he did not know the nature of the plaintiff's relationship with either the defendant or Niman. He also stated that the defendant had never told him the nature of his relationship with the plaintiff.

The defendant's mother testified that she had been unaware that the defendant had been alleged to be the father of the plaintiff's child until the end of August, 1976, when the defendant received correspondence "from welfare" regarding support of the boy.

Finally, Niman was called by the plaintiff in rebuttal. Niman testified that he had not had sexual relations with the plaintiff anytime prior to 1978. He said he had lived with her for about six months in the early 1980s, but that their relationship had not worked out.

He responded affirmatively when asked if the fact that he was not the boy's father had interfered with his relationship with the plaintiff.

The jury also viewed the child, together with the defendant, and later with Niman so his features could be compared to those of each of the men.

The defendant argues that there was insufficient evidence that the plaintiff had been constant in her accusation, that, contrary to the trial court's conclusion, the defendant did not admit ever having had sexual relations with the plaintiff during the period of conception, that the plaintiff failed to adduce any medical evidence regarding the length of her pregnancy and never asked the court to take judicial notice of medical facts pertaining to gestation, and that, since the outcome of the case ultimately rested on the credibility of the witnesses, the jury's decision should not have been disturbed.

The defendant contends that the fact that the plaintiff told only her mother that the defendant was the father of her child is insufficient to establish that she had been constant in her accusation. Constancy of accusation is not an essential element of the plaintiff's prima facie case in a paternity proceeding. *Armstrong* v. *Watrous,* supra; *Holmes* v. *McLean,* supra. We have never considered the mother's declarations or accusations as independent facts showing paternity, but as corroborative only of her testimony in court. *Lavertue* v. *Niman,* supra, 407 n.6; *State* v. *Segerberg,* 131 Conn. 546, 550, 41 A.2d 101 (1945); *Hellman* v. *Karp,* 93 Conn. 317, 320–21, 105 A. 678 (1919). Constancy of accusation evidence is mere surplusage if other evidence is sufficient to support a conclusion of paternity. *Leonard* v. *Miranda,* 38 Conn. Sup. 680, 682, 460 A.2d 1318 (1983). We conclude that other evidence presented by the plaintiff constituted a prima facie case, regard-

less of the existence of constancy of accusation evidence. Therefore, we need not decide whether the plaintiff's declaration to her mother alone was evidence sufficient to establish her prima facie case.

It was undisputed that the child was born after a full-term pregnancy. Further, the defendant did not object to the jury charge that "the period of gestation is a matter of which you may take notice. That is, the normal period of gestation is nine months which means that the time of conception and the time of birth are nine months apart." Nine months had elapsed between the beginning of August, 1975, and May 6, 1976, when the baby was born. The plaintiff did not waver in her assertions that the defendant was the first person with whom she had engaged in sexual relations, that such relations took place during the likely period of conception and that she had not had sexual relations with anyone else during that time. This evidence, added to Urso's testimony of the defendant's alleged admission of paternity, was sufficient to establish a prima facie case.

It thus fell to the defendant to refute the plaintiff's evidence. *Terrasi* v. *Andrews*, supra, 454. Although he denied paternity, his testimony was conflicting as to the times of contact with the plaintiff and was marked by lapses of memory regarding his conversation with Urso and whether he had engaged in sexual intercourse with the plaintiff after she had moved to Yale Street. The only witness that the defendant produced to show that the plaintiff had been having sexual relations with Niman admitted that he did not know the nature of the plaintiff's relationship with either Niman or the defendant. In light of the ambiguity of the defendant's evidence, we conclude that the jury could not reasonably have returned a verdict for him and that the trial court did not abuse its discretion in setting aside the verdict as the result of mistake, prejudice, partiality or sym-

pathy, and in ordering a new trial. Further, where, as here, the relief sought is a new trial, the court has discretion to weigh the evidence and to consider the credibility of the witnesses to determine whether the interests of justice require that the relief be granted. *Gaines* v. *Manson,* 194 Conn. 510, 520–21 n.12, 481 A.2d 1084 (1984). We interfere in the trial court's decision to grant a new trial only where the court has misapplied or mistaken some principle of law or has manifestly abused its discretion. *Loomis* v. *Perkins,* supra, 447. We find no abuse of discretion in the trial court's action.

## II

Finally, the defendant claims that the trial court's 441 day delay in rendering its decision on the motion to set aside the verdict denied the defendant a fair trial, violating his due process rights. The defendant's brief does not articulate his due process claim but posits that Practice Book § 320,[3] which requires that a motion to set aside the verdict be filed within five days after the verdict, discloses a policy that a judge's decision on the motion be rendered within a reasonable time.[4] At oral argument, counsel for the defendant stated that the defendant's property and liberty interests were affected by the delay. He contended that if he is adjudged the father of the plaintiff's child, he will be liable for support from the birth of the child, a period of more than eleven years, and that if he were not able

---

[3] Practice Book § 320 provides in pertinent part: "[M]otions to set aside a verdict . . . must be filed with the clerk within five days after the day the verdict is accepted or judgment rendered . . . ."

[4] The defendant does not assert that General Statutes § 51-183b applies to this case. That statute requires that the judge in a nonjury trial of a civil action render judgment not later than 120 days from the completion date of the trial. The defendant points to § 51-183b, however, as evidence of the legislature's concern for avoiding delay in the judicial process.

to make the payments, he would be subject to incarceration. We are unpersuaded by these arguments.

We agree with the defendant that the lapse of more than one year to decide the motion was an inordinate delay.[5] We have heretofore expressed our disapproval of a trial judge's suspension of a case in limbo by failing to act expeditiously on a motion to set aside a verdict. *Tough* v. *Ives,* 159 Conn. 605, 606–607, 268 A.2d 371 (1970). The record in this case, however, does not reflect whether inquiry was made to the court regarding the status of the motion.[6] Further, the defendant did not pursue the remedy available from this court, an order directing the trial court to dispose of the motion. *Gordon* v. *Feldman,* 164 Conn. 554, 558, 325 A.2d 247 (1973); *Tough* v. *Ives,* supra. Consequently, we presume he acquiesced in the delay.

Moreover, we also find the defendant's due process argument premature. General Statutes § 46b-160 provides that the defendant's liability, if any, for past support is limited to the three years preceding the granting of the paternity petition.[7] Since the defendant has not been adjudged the father of the child, it is obvious that the defendant's liberty and property interests are not yet implicated. In addition, the extent of his liability, should the petition be granted, would not be as far-reaching as he anticipates.

[5] This case is notable for its delay. The action was commenced in September, 1976. The record discloses that the case was dismissed for failure to prosecute with reasonable diligence in January, 1978, but was opened in February, 1978. Nonetheless, it did not come to trial until November 29, 1984, more than six years later. When we heard this appeal, the child was approaching his twelfth birthday.

[6] At oral argument, the defendant said that such inquiry had been made but was not of record.

[7] At oral argument, the attorney general pointed out that General Statutes § 46b-160 had been amended since the institution of this action to limit the liability for past support to the three years preceding the granting of the paternity petition.

There is no error.

In this opinion PETERS, C. J., CALLAHAN and COVELLO, Js., concurred.

SHEA, J., concurring. Although I agree with the majority that the verdict for the defendant in this paternity action should be set aside, I arrive at that result by a different route.

This case is typical of paternity actions, as they have been routinely presented from time immemorial, in that there is very little significant evidence other than the testimony of the interested parties and, in the case of the mother, her declarations to others, which were admitted to show constancy of accusation. Under such circumstances the determination of paternity has ordinarily been deemed to turn upon the credibility of witnesses, a subject deemed to be wholly within the province of the trier, in this case the jury. "The resolution of conflicting testimony is the province of the jury." *State* v. *Amarillo,* 198 Conn. 285, 289, 503 A.2d 146 (1986). Although the opinion cites many cases where a trial court has set aside a verdict, most of these have involved the situation where the conclusions or inferences drawn by the jury from the evidence, which must be viewed most favorably in support of the verdict, could not reasonably have been reached. Where the issue turns upon the conflicting testimony of lay witnesses and no "indisputable physical facts" are involved, as in this case, it is necessary to reach back more than a half century to find a case where this court has approved setting aside a verdict when "the evidence was conflicting, and there was direct evidence in favor of the [party] who prevailed with the jury." *Roma* v. *Thames River Specialties Co.,* 90 Conn. 18, 20, 96 A. 169 (1915). I am disinclined to retrogress to an era when less deference was paid to a jury determi-

nation of credibility, especially in a paternity case typical of so many others in all respects except that the putative father here has prevailed.

I agree, nevertheless, that the trial court properly set aside the verdict in this case, because the transcript indicates that the jury probably was influenced prejudicially by the absence of any evidence of the use of blood typing to determine the paternity of the child. At the conclusion of the charge the jury submitted the following question to the court: "Why was there no blood tests (sic) or typing of the plaintiff, child and defendant?" The trial court's response was: "There was no evidence of that in this case and, therefore, that is not something before you. I cannot by law comment and you are not by law to speculate on something that was not presented in evidence before you in your deliberations."

The standard blood grouping tests for determination of paternity had been performed pursuant to a motion of the defendant filed in 1976, but they did not establish "definite exclusion of the putative father," as General Statutes § 46b-168 requires to make the results admissible in evidence. In *Moore* v. *McNamara,* 201 Conn. 16, 27–33, 513 A.2d 660 (1986), a case decided about three months before the trial of the present action, this court held that the exclusion of blood grouping tests in § 46b-168 was not applicable to the use of genetic marker tests, including the human leukocyte antigen (HLA) test, for the purpose of establishing paternity, though we did not fully resolve whether such evidence was admissible under principles of law relating to evidence derived from recent scientific developments. The use of these new techniques has raised to such a high level the ability of the scientific community to identify the father of a child whose paternity is disputed that the resolution of such an important

issue should no longer be had without such scientific testimony.[1]

Because the issue of paternity is of paramount importance to the child, who is unable to participate in the litigation, the choice of whether to present such evidence ought not to be left to the parties to the action, the mother, the putative father and, in this and many similar cases, the state, as a statutorily necessary party. Practice Book § 484C. The court should exercise its authority to require these genetic marker tests where the parties neglect to provide them. Certainly where the state of Connecticut is involved by virtue of its financial interest in obtaining reimbursement from putative fathers for sums paid to support their children, the additional expense that these newer techniques occasion cannot justify the failure to present such evidence at a trial.

Jurors are sometimes wiser and better informed than courts generally assume. The question asked by the jurors in this case at the commencement of their deliberations demonstrates their dissatisfaction with the traditional swearing contest method for deciding a paternity dispute in the light of common knowledge of the existence of scientific techniques of highly significant probative value for resolution of that issue. Although the trial court cannot be faulted for instructing the jurors not to speculate about something that

---

[1] Some responsible scientific authorities claim that modern scientific techniques have increased the probability of excluding a mistakenly accused man as the father of a child to levels exceeding 99 percent. See Peterson, "A Few Things You Should Know About Paternity Tests (But Were Afraid To Ask)," 22 Santa Clara L. Rev. 667, 671 (1982). Conversely, the probability that a man who has had intercourse with the mother during the probable period of gestation, but whom these techniques do not exclude as the father, may be determined mathematically to be correspondingly great. In *Moore* v. *McNamara*, 201 Conn. 16, 32, 513 A.2d 660 (1986), there was expert testimony that the probability of the defendant's fatherhood ascertained through such procedures was 99.6 percent.

the statute required to be excluded from evidence, the circumstances strongly suggest that the jurors felt frustrated at the lack of any helpful response to their questions and drew an unfavorable inference against the plaintiff because of the absence of the blood typing evidence about which they had inquired.

I agree, therefore, that there was a miscarriage of justice in this case that required the court to set aside the verdict. That miscarriage, however, was not the improper resolution of the credibility issue on the basis of the evidence presented to the jurors but the failure to furnish them with available scientific evidence that, as their question indicates, they deemed vital to a proper determination of the case.

Accordingly, I concur in the result.

