WILLIAM HOWARD, EXECUTOR (ESTATE OF
HEDWIG G. WILLIAMS) *v.* BONNIE
MACDONALD ET AL.
(SC 17136)
(SC 17137)

Sullivan, C. J., and Norcott, Katz, Palmer and Zarella, Js.

--------

Argued May 20—officially released July 13, 2004

*David W. Rubin,* with whom was *Noah J. Schafler,* for the appellee in Docket No. SC 17136, appellant in Docket No. SC 17137 (plaintiff).

*Everett E. Newton,* with whom was *Dena M. Castricone,* for the appellant in Docket No. SC 17136, appellee in Docket No. SC 17137 (named defendant).

*Opinion*

KATZ, J. This case arose from the alleged breach of a fiduciary duty, statutory theft in violation of General

Statutes § 52-564,[1] and exercise of undue influence by the named defendant, Bonnie MacDonald (defendant),[2] in obtaining moneys from Hedwig G. Williams (decedent), who died on August 27, 1998. The dispositive issue in these appeals[3] is whether the trial court properly set aside the jury's verdict in favor of the plaintiff, William Howard, executor of the estate of the decedent, his aunt, against the defendant for statutory theft. We agree with the plaintiff that the trial court abused its discretion in setting aside the jury's verdict and, accordingly, we reverse in part the judgment of the court.

The jury reasonably could have found the following facts. In 1972, the decedent and her husband, William J. Williams, moved into the Merrit Apartments complex in New Canaan, where the defendant and her mother also lived. After her husband's death in 1977, the decedent continued to live alone and was able to take care of her own affairs, until May, 1994, when at age ninety, she gave her nephew, the plaintiff, a durable power of attorney. In June, 1994, the decedent executed her last will and testament and named the plaintiff the executor of her estate, authorizing him to dispose of all her personal property. In her will, the decedent included thirteen specific bequests: four to charities totaling $19,000 and nine to individuals totaling $81,000. Specifically,

[1] General Statutes § 52-564 provides: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

[2] Fairfield County Savings Bank also was named as a defendant in this case. The plaintiff subsequently withdrew his claims against the bank. References herein to the defendant are to Bonnie MacDonald only.

[3] Both the plaintiff and the defendant appealed to the Appellate Court. On February 17, 2004, the parties separately requested that the appeals be transferred to this court. On February 20, 2004, we granted the motions to transfer the appeals pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

Although these appeals were not consolidated, we nevertheless address them together because the disposition in Docket No. SC 17137 eliminates the necessity of deciding the appeal in Docket No. SC 17136.

she left $25,000 to her sister Caroline G. Orell, $15,000 to the plaintiff, $5000 to her brother, $5000 to her niece, $5000 each to two different nephews, $5000 to her brother-in-law, $5000 to her sister-in-law or her husband, and $1000 to Lillian MacDonald, the defendant's mother. The rest, residue and remainder of her estate she bequeathed as follows: one quarter to the Lockwood-Mathews Mansion Museum, one quarter to St. Jude Children's Research Hospital and one half to her sister, Orell. Under the will, if Orell were not to survive the decedent or if she were to die with the decedent under circumstances making it impossible to determine the order of their deaths, or if she were to disclaim her interest, then Orell's portion would pass on to the two aforementioned charities in equal shares. Notably, the will did not mention the defendant.

In 1996, after the decedent had been admitted to the hospital for shortness of breath, the department of social services, through the protective services for the elderly program, began an investigation regarding the decedent's ability to care for herself. Carolyn Kyle, a thirty-three year veteran of social work who became involved in the decedent's case, was concerned because the decedent's "short-term memory was all but gone," she did not recognize family members, she refused or would forget to take her medication and she would not allow a visiting nurse to see her. In deciding whether the decedent should continue to live alone, Kyle found the decedent's situation to be "marginal" and considered filing a conservatorship petition. She decided against that, however, after speaking with the plaintiff, who agreed to seek a durable power of attorney, and after arranging for a visiting nurse and for the defendant and her mother, with whom the decedent was close, to check on the decedent regularly and make sure she took her heart medication.

The plaintiff, who in 1994 had started to notice the decedent's deteriorating mental condition, became actively involved in assisting her with her finances. With her acquiescence, the plaintiff took possession of the decedent's certificates of deposit, savings passbooks, checkbooks, check registers and some securities. He inventoried her assets and provided her with a copy. The plaintiff's calculation indicated that the accounts totaled approximately $300,000. He began paying her rent, telephone, cable and electric bills and sent each company a copy of the power of attorney with a request that all future bills be sent to him directly. Additionally, the plaintiff sent letters to Fairfield County Savings Bank, Norwalk Savings Society and Gateway Bank, informing them of the power of attorney and asking that all future bank statements and 1099 forms be sent directly to him. The plaintiff arranged for a $1500 a month rollover from the decedent's savings account into her checking account. The plaintiff also arranged for the decedent's monthly $606 social security check, as well as $1800, which came from a trust established by her husband's will, to be deposited into the same checking account. From this account, the plaintiff paid the decedent's bills, and along with a brief explanatory note, sent the decedent $75 each week for her needs.

In November, 1996, the plaintiff learned that the defendant had accompanied the decedent to a New Canaan branch of Chase Manhattan Bank, where the decedent requested that a certificate of deposit be transferred to the defendant. Dorothy Fronio, a bank employee who had known the decedent for several years, called the plaintiff's office to express concern. Fronio had observed the decedent's mental state deteriorate during the course of several years. Often, when she came into the bank, the decedent forgot why she was there and wondered whether she was in the correct bank. On those occasions, Fronio, who knew that the

plaintiff had a power of attorney, telephoned him for direction. Therefore, Fronio was concerned when, in November, 1996, the decedent came into the bank with a woman, whom Fronio did not know, to withdraw a large sum of money. Fronio found the decedent to be "in her normal confused state . . . ." According to Fronio, the decedent "was confused about why she was there. I didn't think that she really wanted to [withdraw the money], or knew what she was doing." The defendant did most of the talking and explained that the decedent was lending her money for an educational purpose. Fronio's impression was that the decedent did not know why she was signing the withdrawal slip or even that "she was giving away a large sum of money." As someone trained by the bank in looking out for the elderly, Fronio was concerned that the decedent was being taken advantage of by the defendant. As a result, Fronio refused to disburse the money, which caused the defendant to be "a little bit perturbed."

On December 20, 1996, the decedent wrote the plaintiff a letter advising him that she wanted to give the defendant a gift but she did not provide an amount. Specifically, the decedent asked him to sign forms that would allow her to give the defendant "a gift of [blank] to assist her in law school." The form of this letter was not consistent with notes she had sent him in the past. As a result, the plaintiff telephoned the decedent on January 6, 1997, to ascertain what amount she had in mind. When she did not articulate an amount, the plaintiff questioned her whether $5000 was what she intended, but the decedent could not answer and stated that she would get back to him after checking her notes. The plaintiff explained to her that gifts for educational purposes could be made directly to the school involved.

On the very next day, January 7, the decedent made arrangements to transfer $35,000 from an investment account at the Norwalk Savings Society, of which the

plaintiff had been unaware. The defendant telephoned the bank and personally asked the representative how much money the decedent had in her various accounts. The defendant made a second telephone call to ascertain how the funds could be transferred to her. Then, outside the decedent's presence, the defendant typed a letter to the bank to effectuate the transfer of the $35,000 in the investment account to her and her mother over the course of the following two years. The letter was complete with details of amounts, account numbers, social security numbers and specific instructions. Within one week, the bank sent a check for $10,000 to the defendant and another check for $10,000 to the defendant's mother, who subsequently turned those funds over to the defendant. The plaintiff only learned about this transfer in March, 1997, after Stephen B. Keogh, an attorney who subsequently was appointed as the decedent's conservator, brought it to his attention. Otherwise, the plaintiff would not have discovered the withdrawal until the following January when the bank would have issued a 1099 form.

On January 23, 1997, approximately two weeks after the first transfer of funds from the Norwalk Savings Society, the plaintiff received a telephone call at home from the decedent, through the assistance of a telephone operator. The decedent was in an agitated state as she explained that she had gone to the Fairfield County Savings Bank with the defendant where the decedent withdrew all the money in her account and transferred the funds to the defendant. The decedent told the plaintiff that she wanted him to get the money back. He believed that, by being in possession of the decedent's actual passbook as previously arranged under his power of attorney, the funds were safe. As in the case of the withdrawal from the Norwalk Savings Society account, had the decedent not telephoned the plaintiff, he would not have discovered the withdrawal

of $94,242.09 until the following January when the 1099 form would have been issued.

Immediately thereafter, the plaintiff telephoned the MacDonald residence hoping to speak with the defendant to ask her to return the funds. She was not home, but the plaintiff spoke with the defendant's mother and explained to her that he did not think the transfer was appropriate in light of the decedent's mental state, and he requested that the money be returned. She hung up on him, at which point he telephoned the decedent to advise her "to stay away from the MacDonalds." The decedent responded that she would not answer her door.

The plaintiff then contacted the office of George F. Carroll, Jr., the decedent's attorney and the person responsible for her will, and, with the aid of another attorney in the partnership, William D. Lane, confirmed that the funds had been withdrawn from the Fairfield County Savings Bank. Letters were sent to the MacDonalds demanding that the money be returned. The plaintiff and Carroll froze the remaining accounts and concluded that they needed to get a conservator appointed because the power of attorney that the plaintiff had was insufficient to protect the decedent's assets. The plaintiff attempted several times over the next few days to contact the decedent, and when he finally reached her by telephone a few days later, she had no independent recollection of having spoken with him on January 23. The decedent explained that she had been with the MacDonalds the previous few days and she told the plaintiff that they were her very good friends, that she had intended to make a gift of the funds, and that she did not want any other visitors. The plaintiff subsequently learned that the defendant had been in the room with the decedent during this telephone conversation.

The plaintiff proceeded with the application to appoint a conservator. During the proceeding in the Probate Court, the decedent could not identify the plaintiff or Charles Brower, an attorney from Torrington, to whose office the defendant had brought the decedent several times.[4] The decedent had little or no memory of the transfer of funds from her accounts to the defendant. Indeed, her testimony at the conservatorship hearing demonstrated that she thought she had walked to the bank by herself, that she could not recall if she had signed any papers, and that she did not know what she had done with the money or how much she had withdrawn, nor did she know whether she had given the money to anyone.

Following the Probate Court's appointment of Keogh as her conservator, the decedent, at the defendant's suggestion, telephoned David Wallman, an attorney to whom the defendant's attorney had referred her because the decedent "was looking for a lawyer to represent her in an issue about a gift." According to Wallman, the decedent appeared to be reading from a script and could not answer even the most basic questions he posed to her. Wallman telephoned her back moments later, after having spoken with Keogh in the interim, and the decedent had no recollection of having had a conversation with him. Wallman thought her to be "highly vulnerable and highly isolated . . . ." The defendant subsequently testified that she had been the person encouraging the decedent to retain counsel. See footnote 4 of this opinion.

Keogh made the discovery that the decedent had arranged for the transfer of $35,000 to be made from one of her Norwalk Savings Society accounts to the

---

[4] The defendant had made several attempts to get counsel for the decedent to enable her to "fight" the plaintiff's conservatorship petition and to protect the transfers that had been made. Brower was but one of the attorneys they contacted.

defendant and her mother. The bank had been instructed by the decedent to transfer $10,000 to the defendant and $10,000 to the defendant's mother in 1997 and to transfer the remaining $15,000 to the defendant in two separate installments during the following two years. Keogh instructed the bank not to make the transfers that were to occur in the future. He also hired another attorney, Edward P. McCreery III, to conduct an investigation into the situation, in an effort to determine how best to proceed in connection with the funds that already had been transferred to the defendant. McCreery concluded, after conducting interviews with Kyle, Fronio, the plaintiff, the defendant and her mother, the decedent, and Brower, that the gifts were "the result of direct manipulation" by the defendant. McCreery believed that if the decedent had been of sound mental capacity, she probably would have limited her gifts to amounts consistent with previous monetary gifts she had made to others.[5] In fact, McCreery testified that he thought that if *he* had asked the decedent for a check during his interview with her, she would have accommodated him.

The defendant admitted that on January 22, 1997, she had contacted Norwalk Savings Society because the decedent wanted to give her money. According to the defendant, the decedent selected that bank for the transfer because she did not believe that the plaintiff was aware of all the decedent's accounts at that bank. In actuality, there was one account at Norwalk Savings Society listed on the inventory that the plaintiff had

---

[5] The decedent historically had given nieces and nephews money to be used for their children for educational purposes. For example, in the late 1970s, the plaintiff's sister had four children and the decedent gave her $20,000, spread out over two to three years in order to fall within the federal annual gift tax exclusion. Later, when the tax law changed, the decedent, over the course of two years, gave the plaintiff and his spouse $25,000 toward their son's education, and in 1994, she gave $10,000 to the plaintiff's cousin toward his oldest child's education.

provided to the decedent, but the $35,000 was transferred from a different account with which the plaintiff was unfamiliar. The transfers from Norwalk Savings Society were staggered at the suggestion of the defendant's mother to avoid any gift tax, but the withdrawal of $94,242.09 from Fairfield County Savings bank was done in one lump sum. The defendant was aware that to effectuate that transfer, the decedent needed the passbook, which she presumed was in the plaintiff's possession. Therefore, to avoid involving the plaintiff, the defendant telephoned the bank to learn what had to be done in order for the decedent to withdraw the funds. She did not advise the bank that the plaintiff had a power of attorney or that he was in possession of the passbook. Instead, upon instruction from the bank, the defendant advised the decedent that she needed some form of photographic identification to withdraw the funds, in response to which the decedent retrieved her passport. The defendant then drove the decedent to Fairfield Savings Society, where the defendant obtained a lost passbook withdrawal order for the decedent to sign, despite the fact that the defendant knew that the passbook was not lost. The defendant stood next to the decedent while she signed the passbook withdrawal order. Although the bank teller advised them to put the money in a revocable trust, the funds were transferred into a new account in the defendant's name only. The next day, the defendant withdrew the money from Fairfield County Savings and deposited it in a new account in her name at a bank in New Canaan.

According to the defendant, the decedent wanted to help her with law school tuition, which, after $20,000 in aid from the school was deducted, approximated $43,000. Soon thereafter, the defendant's mother gave the defendant the $10,000 that the decedent had given to her. That $10,000, along with the $10,000 the defendant had received from the Norwalk Savings Society

account and the $94,242.09 transferred from Fairfield County Savings, far exceeded the $43,000 the defendant needed for educational purposes. In various notes subsequently written by the decedent, at the defendant's request and under her guidance, the decedent explained those "concerned" that it was her intent to give this money to the defendant, that she did not want the plaintiff to bring any legal action to recover the money and, finally, that the money was for the defendant's educational needs, as well as for her birthday. Additionally, sometime after the first probate hearing and before the Probate Court appointed Keogh her conservator, the decedent wrote by hand a letter to another attorney asking him to change her will to eliminate any bequests to the plaintiff, to leave her sister only $100,[6] to provide $40,000 in specific bequests, including one bequest of $7000 to the defendant's mother, and to leave the rest of the estate to be divided among two charities and the defendant and her mother. The changes requested by the defendant never were made. In an effort to explain the gifts, as well as the decedent's failed attempt to revise her will, the defendant related how she and her mother had cared for the decedent and how they shared a close personal relationship with the decedent.

On the basis of this evidence, the jury found that the defendant had exerted undue influence over the decedent and that she had breached a fiduciary duty to the decedent. In connection with those two counts, the jury awarded the plaintiff $94,259.11 in damages. Additionally, the jury found by clear and convincing evidence that the defendant had committed statutory theft and awarded the plaintiff treble damages in the amount of $282,777.33 in connection with that count. The jury returned a verdict for the plaintiff on the defen-

---

[6] The change regarding the bequest to the decedent's sister was apparently the result of the decedent's consternation over some ash trays the sister allegedly had stolen from the decedent's apartment.

dant's counterclaim of intentional infliction of emotional distress.

The defendant thereafter filed a motion to set aside the verdict on all three counts of the plaintiff's complaint. The trial court agreed with the defendant that there was insufficient evidence upon which to find that there had been a fiduciary relationship between the defendant and the decedent and, accordingly, granted the defendant's motion in connection with that count. The trial court rejected the defendant's claim of trial court impropriety with regard to the jury instruction on the undue influence count. The court also determined that there had been sufficient evidence of undue influence exerted by the defendant upon which the jury reasonably reached its verdict. Accordingly, the court denied the defendant's motion to set aside that count. In addition, the trial court, citing the conflicting evidence, determined that the plaintiff had not proven by clear and convincing evidence that the defendant had committed statutory theft in violation of § 52-564. Specifically, the trial court focused on the testimony of several witnesses who testified that the decedent had told them that she knew she was forgetful, that she wanted to give a gift to the defendant for educational purposes, that she did not want the money returned, and that it was her own idea to pay for the defendant's law school education. The trial court found the evidence to be "loose, equivocal [and] contradictory." Accordingly, the trial court granted the defendant's motion to set aside the verdict in connection with the statutory theft count. Finally, the court determined that the jury reasonably rejected the defendant's special defense of waiver and that the defendant could not prevail on her various claims of evidentiary improprieties.

The defendant appealed from the judgment against her for exerting undue influence (Docket No. SC 17136) and the plaintiff appealed separately from the judgment

in favor of the defendant on the remaining two counts of breach of fiduciary duty and statutory theft (Docket No. SC 17137). Specifically, the defendant claims that the jury instruction contained a provision permitting the jury to shift to her the burden of proof of fair dealing by clear and convincing evidence if it found that she had been a fiduciary and that, absent evidence of a fiduciary relationship, the trial court improperly allowed the jury to misapply that burden to the undue influence count.[7] In response, the plaintiff argues that the defendant failed to preserve that claim and, further, that the jury interrogatory demonstrates that he proved undue influence by a fair preponderance of the evidence standard. The defendant contends, however, that the jury's answer to the interrogatory does not remedy the harm done by the erroneous instruction.

In connection with his appeal, the plaintiff claims that the trial court improperly applied an incorrect standard of clear and convincing evidence in connection with the statutory theft count. The plaintiff also claims that, even applying this higher standard, he satisfied that burden and the trial court improperly misapplied this standard and invaded the province of the jury in setting aside its verdict. Finally, the plaintiff claims that the trial court improperly set aside the jury's verdict regarding the defendant's breach of her fiduciary duties to the decedent. The defendant argues in response that: the trial court properly applied the clear and convincing standard of proof to the statutory theft count in setting aside the jury's verdict because § 52-564 incorporates the standard of proof applicable to fraud claims; the court had the discretion to conclude that the verdict

---

[7] The defendant also raised the claim that "mere friendship is not a sufficient basis for fiduciary duty," essentially as an alternate ground for affirmance. The defendant, however, had attempted to seek permission to file a statement of alternate grounds for affirmance, which motion was denied on November 20, 2003.

was unreasonable in light of the evidence that the decedent was mentally competent to make the gifts at issue; and evidence of the defendant's friendship with the decedent is not enough for the jury to have determined that the defendant owed her a fiduciary duty. We agree with the plaintiff that, even if the higher standard of clear and convincing evidence applied to the statutory theft count, the plaintiff satisfied his burden of proof and the trial court improperly set aside the verdict as to that count. Consequently, because the statutory theft count resulted in the jury's verdict of treble damages in favor of the plaintiff, and because a litigant may recover damages for the same loss only once, we need not decide either the plaintiff's or the defendant's remaining claims on appeal. *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 23, 699 A.2d 964 (1997).

I

We begin with a brief discussion of the appropriate standard of review. "The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence. *O'Brien* v. *Seyer*, 183 Conn. 199, 208, 439 A.2d 292 (1981). The supervision which a judge has over the verdict is an essential part of the jury system. . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles, or as to justify the suspicion that they or some of them were influenced by prejudice, corruption or partiality. *Burr* v. *Harty*, 75 Conn. 127, 129, 52 A. 724 (1902). The court has a duty to set aside the verdict where the jury's action is so unreasonable as to suggest that it was the product of such improper influences. *State* v. *Avcollie*, 178 Conn. 450, 457, 423

A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980), aff'd, 188 Conn. 626, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983); *Roma* v. *Thames River Specialties Co.*, 90 Conn. 18, 19–20, 96 A. 169 (1915)." (Internal quotation marks omitted.) *Palomba* v. *Gray*, 208 Conn. 21, 23–24, 543 A.2d 1331 (1988).

We recognize that, "[i]n determining whether to set aside the verdict, the trial court walks a thin line. . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion"; (internal quotation marks omitted) *Labbe* v. *Pension Commission*, 239 Conn. 168, 192, 682 A.2d 490 (1996); that, in the absence of clear abuse, we shall not disturb. "Our review of the trial court's action on a motion to set aside the verdict involves a determination of whether the trial court abused its discretion, according great weight to the action of the trial court and indulging every reasonable presumption in favor of its correctness; *Labatt* v. *Grunewald*, 182 Conn. 236, 240–41, 438 A.2d 85 (1980); *Levitz* v. *Jewish Home for the Aged, Inc.*, 156 Conn. 193, 198, 239 A.2d 490 (1968); since the trial judge has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their evidence. *Loomis* v. *Perkins*, 70 Conn. 444, 447, 39 A. 797 (1898). Moreover, the trial judge can gauge the tenor of the trial, as we, on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury. *Mather* v. *Griffin Hospital*, 207 Conn. 125, 139, 540 A.2d 666 (1988); *Birgel* v. *Heintz*, 163 Conn. 23, 26, 301 A.2d 249 (1972). The focus of our inquiry is the action of the trial court in setting aside the verdict. *Campbell* v. *Gould*, 194 Conn. 35, 39, 478 A.2d 596 (1984)." *Palomba* v. *Gray*, supra, 208 Conn. 24–25.

Finally, in evaluating the exercise of the trial court's discretion, we are mindful that litigants have a constitutional right to have juries decide issues of fact. "The right to a jury trial is fundamental in our judicial system, and this court has said that the right is one obviously immovable limitation on the legal discretion of the court to set aside a verdict, since the constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court. *Camp* v. *Booth*, 160 Conn. 10, 13, 273 A.2d 714 (1970). Since, in setting aside the verdict, the trial court has deprived the party in whose favor the verdict was rendered of his constitutional right to have factual issues resolved by the jury, we must examine the evidential basis of the verdict itself to determine whether the trial court abused its discretion. *Jacobs* v. *Goodspeed*, [180 Conn. 415, 417, 429 A.2d 915 (1980)]." (Internal quotation marks omitted.) *Palomba* v. *Gray*, supra, 208 Conn. 25.

## II

In the present case, the trial court determined that, in order to prevail, the plaintiff was required to prove statutory theft by clear and convincing evidence and that, because the evidence was "loose, equivocal [and] contradictory," he failed to meet his burden. In deciding the standard of proof issue, the trial court remarked upon the criminal underpinnings of this civil cause of action. This was consistent with the treatment of this issue by the Appellate Court in *Suarez-Negrete* v. *Trotta*, 47 Conn. App. 517, 520–21, 705 A.2d 215 (1998). In that case, the plaintiff had sought damages pursuant to § 52-564, which authorizes treble damages where a person steals the property of another. Id., 520. Citing *Schaffer* v. *Lindy*, 8 Conn. App. 96, 104–105, 511 A.2d 1022 (1986), the Appellate Court held that "the plaintiff was required to satisfy the higher standard of proof by

clear and convincing evidence to be entitled to an award of treble damages pursuant to § 52-564."[8] *Suarez-Negrete* v. *Trotta*, supra, 520.

The plaintiff claims on appeal that *Schaffer* has been expressly disavowed by this court. He points to *Freeman* v. *Alamo Management Co.*, 221 Conn. 674, 682–83, 607 A.2d 370 (1992), wherein this court held that "[n]o higher standard of proof is required when a plaintiff seeks to prove criminal activity in a civil action; see *Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 327–29 n.14, 593 A.2d 478 (1991); *Verrastro* v. *Middlesex Ins. Co.*, 207 Conn. 179, 181–83, 540 A.2d 693 (1988); or . . . in a common law claim for punitive damages, in which a plaintiff must allege and prove that a defendant's misconduct was wanton or wilfully malicious. See *Markey* v. *Santangelo*, [195 Conn. 76, 77, 485 A.2d 1305 (1985)]. The contrary rule for libel actions involving a public

---

[8] In reaching this determination, the Appellate Court remarked: "Statutory theft under § 52-564 is synonymous with larceny under General Statutes § 53a-119. *Discover Leasing, Inc.* v. *Murphy*, 33 Conn. App. 303, 309, 635 A.2d 843 (1993), citing *Lauder* v. *Peck*, 11 Conn. App. 161, 165, 526 A.2d 539 (1987). Pursuant to § 53a-119, [a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or [withholds] such property from an owner. By comparison, [c]onversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights. *Discover Leasing, Inc.* v. *Murphy*, supra, 309, citing *Devitt* v. *Manulik*, 176 Conn. 657, 660, 410 A.2d 465 (1979). In addition, conversion requires that the owner be harmed as a result of the unauthorized act. *Devitt* v. *Manulik*, supra, 660. Conversion may arise subsequent to an initial rightful possession. *Maroun* v. *Tarro*, 35 Conn. App. 391, 396, 646 A.2d 251, cert. denied, 231 Conn. 926, 648 A.2d 164 (1994). Conversion can be distinguished from statutory theft as established by § 53a-119 in two ways. First, statutory theft requires an intent to deprive another of his property; second, conversion requires the owner to be harmed by a defendant's conduct. Therefore, statutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion. *Lawson* v. *Whitey's Frame Shop*, 42 Conn. App. 599, 605–606, 682 A.2d 1016 (1996), rev'd on other grounds, 241 Conn. 678, 697 A.2d 1137 (1997)." (Internal quotation marks omitted.) *Suarez-Negrete* v. *Trotta*, supra, 47 Conn. App. 520–21.

figure; *Dacey* v. *Connecticut Bar Assn.*, 170 Conn. 520, 535–38, 368 A.2d 125 (1976); rests primarily on the constitutional right to freedom of speech, rather than on the need for an enhanced standard of proof because of a perceived need for greater certainty in adjudication. Id., 536.

"We disagree, therefore, with the Appellate Court's conclusion in this case, and in its earlier case of *Schaffer* v. *Lindy*, [supra, 8 Conn. App. 104–105], that clear and convincing proof is an appropriate standard of proof whenever claims of tortious conduct have serious consequences or harsh or far-reaching effects on individuals or require the proof of willful, wrongful and unlawful acts. Absent evidence of legislative intent to the contrary, we continue to presume that when a statutory private right of action includes multiple damages, the plaintiff's burden of proof is the same as that in other tort cases."

Section 52-564 is silent on the burden of proof issue. We need not decide expressly, however, whether, in order to prevail on his claim for relief under a theory of statutory theft, the plaintiff must prove the elements by clear and convincing evidence or a preponderance of the evidence, because we conclude that, even under the heightened burden, the plaintiff provided sufficient evidence that the jury reasonably could have believed to support its conclusion that the defendant had committed statutory theft as that cause of action has been defined. See footnote 8 of this opinion.

Aside from the plaintiff's testimony, the jury heard from several independent witnesses regarding the decedent's frail state of mind. Kyle related that the decedent's "short-term memory was all but gone," that she did not recognize family members, that she refused or would forget to take her medication, and that she would not allow a visiting nurse to see her. Fronio testified

that the decedent appeared to be unaware of what she was doing and why she was at the bank or that she was attempting to give away a large sum of money. Wallman found the decedent "highly vulnerable and highly isolated . . . ." He had serious questions about whether she had any idea of what was happening to her. McCreery related that the decedent had no recollection at all of any transfer of funds from Fairfield County Savings Bank and he testified that he thought that she would have written *him* a check had he asked for one.

The decedent's own testimony at the conservatorship hearing demonstrated that she was clueless about the transfer of more than $94,000 just weeks earlier. Indeed, she did not remember from which bank she had withdrawn the funds, how she got to the bank, what she did with the money after she withdrew the funds, whether she had telephoned the plaintiff or to whom she had given the money. On the basis of this evidence, again independent of the plaintiff's testimony regarding his aunt's aberrant behavior, her deteriorating mental state and her pleas to him to get her money returned, the jury reasonably could have found that the decedent was frail, confused and disoriented and that her cognitive difficulties were so severe that she was incapable of formulating the ability to consent to or authorize the withdrawal or transfer of funds to the defendant.

In addition, the defendant admitted that she knew that the plaintiff had a power of attorney to handle the decedent's finances, that he had taken possession of her passbooks and that she, nevertheless, assisted the decedent in filling out a lost passbook withdrawal order to gain access to the decedent's funds at the Fairfield County Savings Bank. The defendant admitted to a level of participation in connection with the transfer of funds from the Norwalk Savings Society that virtually eliminated any involvement by the decedent. Therefore, the jury reasonably could have found that the defendant

had attempted to isolate the decedent from those individuals who were concerned for the security of her assets, and that, once a conservatorship hearing had been scheduled, the defendant went to great lengths to contest the plaintiff's attempts to appoint a conservator and discredit the transfers. She tried to retain counsel for the decedent, she "coached" her in her interactions with the plaintiff, and, essentially, attempted to create an environment of "us versus them."

On the basis of this evidence, the jury reasonably could have found that the decedent's money was transferred with the specific intent to deprive permanently the decedent of her assets. The defendant's intent to deprive the decedent of her assets was demonstrated, not only by the decedent's obvious inability to consent to the transfers, but also by the lengths to which the defendant had gone to gain control over the funds. Therefore, the jury reasonably could have found, on the basis of the evidence presented at trial, that the defendant intended permanently to appropriate the decedent's assets for her own use, that the decedent was incapable of giving consent for the transfers and that the defendant was aware of the decedent's diminished mental capacity. Consequently, the jury reasonably could have concluded that the plaintiff had proven a violation of § 52-564 by clear and convincing evidence. Therefore, we conclude that the trial court abused its discretion in setting aside the verdict in connection with that count.

The judgment is reversed in part and the case is remanded with direction to reinstate the judgment for the plaintiff on the statutory theft count in accordance with the jury's verdict.

In this opinion the other justices concurred.